UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DAVID PEER and DEPENDABLE LOCKS, INC., a New York corporation,<br><br>        Plaintiffs,<br><br>  vs.<br><br>RICHARD CAUBLE, in his individual capacity, and JOHN LAGATTUTA, in his individual capacity,<br><br>        Defendant. | 08 C 5469<br><br>Judge Feinerman |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs David Peer and Dependable Locks, Inc. allege in this action, brought under 42 U.S.C. § 1983, that Defendants Richard Cauble and John Lagattuta violated their Fourteenth Amendment rights. Defendants have moved for summary judgment. For the reasons that follow, the motion is granted in part and denied in part.

**Background**

The following facts are undisputed or, if genuinely disputed, are set forth with the disputes resolved in Plaintiffs' favor.* Dependable, a locksmith business incorporated in New York, since June 2006 has been licensed by the Illinois Department of Financial and Professional Regulation ("IDFPR") as a locksmith agency. Peer, the Israeli-born majority shareholder of Dependable, also since June 2006 has been licensed by IDFPR as a locksmith. At all relevant

---

* Both sides have moved to strike portions of the other side's Local Rule 56.1 statements. *See* Doc. 86 at 2-11, 13-17; Doc. 87. The motions are denied; they are largely without merit, and to the extent they have merit, the improper portions of the Local Rule 56.1 statements have been disregarded.

-1-

times, Cauble was IDFPR's Deputy Director of Statewide Enforcement and Lagattuta was an Investigator for IDFPR's Division of Professional Regulation.

Around the time Peer and Dependable applied for their licenses in February 2006, IDFPR received applications from several Israeli-born men who had served in the military, who applied from New York, who listed the same New York resident as a contact, and who had failed by a wide margin a locksmith test administered by one testing service before passing with another testing service. IDFPR took note of the Israeli-born applicants because in past years it had received numerous reports of fraudulent misconduct by locksmith companies with similar profiles. One such company was Price Line Locksmiths. In August 2006, after a four-year investigation, Price Line and IDFPR entered into a Consent Order requiring Price Line and its owner to cease all business activity in Illinois. The Consent Order listed twenty-six "doing business as" names under which Price Line was forbidden to operate, one being "Dependable." Lagattuta was actively involved in the Price Line case and helped to negotiate the Consent Order. *See* Doc. 86 at 7, ¶ 21.

Several of the reports against the out-of-state, Israeli-born locksmiths were filed by Michael Bronzell, the former Vice President of the Illinois Indiana Locksmith Association. In early January 2006, Bronzell met with then-Governor Blagojevich in the Governor's office to complain that the IDFPR had failed to take enforcement action against the out-of-state, Israeli-born locksmith companies that Bronzell had reported. *See* Doc. 91 at 2, ¶ 3. At the direction of the Governor's Office, IDFPR Director Daniel Bluthardt contacted Bronzell to discuss his concerns. *See id*. at 2, ¶ 4. On January 12, 2006, Bronzell appeared at an IDFPR Locksmith Board meeting, also attended by Bluthardt and Lagattuta, to complain about "Israeli-owned" locksmith companies. *See id*. at 2-4, ¶¶ 5-8.

On February 1, 2006, after meeting with Bluthardt, IDFPR Chief Testing Officer Mary Jo Southard Lobmaster pulled seven locksmith applications submitted by Israeli-born applicants and gave them to Lagattuta, who forwarded them to IDFPR Chief of Investigations Dan Angarola. *See id*. at 4, ¶¶ 9. At around that time, Lagattuta told Lobmaster that Governor Blagojevich was interested in the applications, and indicated that he (Lagattuta) would keep Bluthardt and the Governor's Office apprised of the situation. *See* Doc. 86-2, at 3, ¶ 10 (citing Lobmaster Dep. (Doc. 85-5) at 40:1-8, 41:11-24, 46:8–48:25). When asked at her deposition which criteria were used to select the seven applications, Lobmaster pointed only to the applicants' country of origin, Israel. *See id*. at 3, ¶ 11 (citing Lobmaster Dep. (Doc. 85-5) at 14:4-9). At least six other out-of-state locksmiths, all presumably without Israeli connections, were not targeted for additional scrutiny. *See* Doc. 91 at 14-15, ¶ 34.

In the meantime, Peer acquired the rights to the "Dependable" name from Superb Solutions, which had an option on Price Line's "doing business as" names. Although not among the seven applications pulled by Lobmaster in February 2006, Dependable and Peer were subject to an IDFPR investigation from July 11, 2006—less than a month after receiving their licenses—until September 20, 2006. The investigation, prompted by an informal complaint from Bronzell, was led by Cauble. Cauble claims that the investigation was intended to determine whether Dependable was the same company as Price Line. Indeed, Cauble found that two telephone numbers previously associated with Price Line were answered by operators working for Dependable; when asked about those numbers at his deposition, Peer refused to answer on Fifth Amendment grounds. While Lagattuta was not involved in the decision to commence the investigation into Peer and Dependable, he oversaw every investigation conducted by the Department, directed all investigations concerning the Israeli-born applicants, and sent Bluthardt

weekly reports on pending investigations, including the Dependable investigation. *See* Doc. 91 at 12-13, ¶¶ 28-30.

Upon concluding the investigation, Cauble reported that Dependable "apparently violated Section 447/40-10(A)(1) of the [Illinois Private Detective, Private Alarm, Private Security and Locksmith Act, 225 ILCS 447/5-10 *et seq*.], in that they appear to be circumventing an investigative case and changing the name of a Suspended Locksmith Agency," and referred the case for prosecution. Upon receiving the referral, IDFPR prosecutors Deborah Alexander and John Lartz petitioned for a summary suspension of Peer's and Dependable's licenses. Alexander suspected that Dependable was Price Line in a different guise, a suspicion based on the two common telephone numbers, her belief that Peer worked for Superb Solutions, and her impression that Superb Solutions held money for Price Line. Lagattuta personally authorized the petition for summary suspension; he claims to have believed that Dependable was a reconstituted Price Line, that the address listed on Dependable's locksmith application was fraudulent, and that Dependable was operating in violation of the Price Line Consent Order. The petition for summary suspension, however, alleged only that Dependable's application listed a fraudulent address; it did not allege that Dependable and Price Line were the same company or that the former was in any way the successor to the latter. *See* Doc. 85-16; Doc. 91 at 8-9, ¶ 19.

On September 22, 2006, after an *ex parte* hearing at which Cauble was the sole witness, IDFPR summarily suspended Plaintiffs' licenses. These were the first summary suspensions imposed by IDFPR on a locksmith, and were premised (like the petition) on the finding that Plaintiffs' applications had listed a fraudulent address, even though IDFPR Deputy General Counsel Don Seasock had advised, and IDFPR employees generally understood, that the

Locksmith Act and its implementing regulations did not require locksmiths to operate their businesses from a particular address. *See* Doc. 91 at 6, 9-10, ¶¶ 13, 21-22.

In late October and early November 2006, IDFPR held an administrative hearing to review the summary suspension. The hearing officer recommended to the IDFPR Locksmith Board that Peer's and Dependable's licenses be indefinitely suspended, for a minimum of two years. *See id*. at 12, ¶¶ 27. On June 8, 2007, the Locksmith Board recommended to Director Bluthardt that he impose an indefinite suspension, but for minimum of five years. *See ibid*. On October 2, 2007, the Director entered a Final Order accepting the Board's recommendation. *See ibid*.

Peer and Dependable then filed an administrative review action in the Circuit Court of Cook County. The circuit court overturned the Director's Final Order, holding that (1) IDFPR did not sustain its burden to prove that Peer and Dependable were guilty of fraud in connection with their license application, and (2) any presumed connection between Price Line and Dependable violated due process because the connection was not appropriately charged as an offense. *See* Doc. 85-24 at 10. IDFPR did not appeal the circuit court's judgment.

Peer and Dependable filed this action in September 2008 against Cauble, Lagattuta, Bronzell, and Thomas Glavin, a member of the IDFPR Locksmith Board. The court dismissed the claims against Bronzell and Glavin, *see* Doc. 40 (St. Eve, J.), and then allowed Plaintiffs to amend their complaint with an equal protection/national origin claim against Lagattuta only, *see* Doc. 72 (St. Eve, J.). The operative complaint (Doc. 74) has three counts. Count I seeks relief against Cauble and Lagattuta on a substantive due process theory; Counts II alleges that Lagattuta discriminated against Peer and Dependable based on their national origin in violation

of the Equal Protection Clause; and Count III seeks relief against Cauble and Lagattuta on a "class of one" equal protection theory.

## Discussion

In seeking summary judgment, Lagattuta invokes absolute immunity and both defendants invoke qualified immunity. The immunity defenses are considered in turn.

### A.     Absolute Immunity

Settled law holds that "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). Absolute immunity bars civil claims that the plaintiff was prosecuted because of his race, national origin, or religion. *See Omegbu v. Milwaukee Cnty.*, 326 Fed. Appx. 940, 943 (7th Cir. 2009); *Redwood v. Dobson*, 476 F.3d 462, 466 (7th Cir. 2007); *Vakilian v. Shaw*, 302 Fed. Appx. 350, 358 (6th Cir. 2008). It also applies where the prosecutor lacked probable cause to initiate a prosecution. *See Imbler v. Pachtman*, 424 U.S. 409, 422-25 (1976); *Spiegel v. Rabinovitz*, 121 F.3d 251, 257 (7th Cir. 1997). And it applies not only to criminal prosecutions, but also to civil prosecutions before an administrative agency. *See Mendenhall v. Goldsmith*, 59 F.3d 685, 690-91 (7th Cir. 1995) (because "[a]n agency official, like a prosecutor, may have broad discretion in deciding whether a proceeding should be brought and what sanctions should be sought," absolute immunity applies so long as the prosecutor is "functioning in an enforcement role analogous to" that of a criminal prosecutor) (citation omitted); *Cornejo v. Bell*, 592 F.3d 121, 127-28 (2d Cir. 2010) ("This Court has previously extended absolute immunity to state and federal officials initiating noncriminal proceedings such as administrative proceedings and civil litigation."). Supervisory attorneys, meaning those who do not personally handle a case

but are responsible for overseeing those that do, are entitled to absolute immunity to the same extent as their subordinates. *See Van de Kamp v. Goldstein*, 129 S. Ct. 855, 862 (2009).

The scope of absolute immunity is limited, however, to conduct that is "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430; *see also Mendenhall*, 58 F.3d at 689. Such conduct includes the decision to prosecute, *Imbler*, 424 U.S. at 431; participation in a probable cause hearing, *Burns v. Reed*, 500 U.S. 478, 490-92 (1991); presentation of the state's case at trial, *Buckley*, 509 U.S. at 269; and the evaluation or selection of evidence for presentation to a grand jury, *Kalina v. Fletcher*, 522 U.S. 118, 130-31 (1997). Absolute immunity does not protect "investigative" tasks undertaken by a prosecutor. *Van de Kamp*, 129 S. Ct. at 61; *see also Hartman v. Moore*, 547 U.S. 250, 262 n.8 (2006) ("An action could still be brought against a prosecutor for conduct taken in an investigatory capacity, to which absolute immunity does not extend."); *Hill v. Coppleson*, 627 F.3d 601, 605-06 (7th Cir. 2010). The individual seeking absolute immunity "bears the burden of showing that such immunity is justified for the function in question." *Burns*, 500 U.S. at 486.

Under these precedents, Lagattuta's prosecutorial actions—his approval of the petition for summary suspension, and any conduct in connection with the summary suspension hearing, the hearing where an indefinite suspension was sought and issued, the Locksmith Board's recommendation to the Director, the Director's Final Order, and the administrative review hearing in the state circuit court—is protected by absolute immunity. *See Lucien v. Preiner*, 967 F.2d 1166, 1167 (7th Cir. 1992) ("[t]he state's attorney is performing a prosecutorial duty when she helps the court ascertain the appropriate sentence for a particular defendant"). Absolute immunity does not attach, however, to Lagattuta's conduct prior to the prosecutorial phase—meaning his actions regarding the decision to investigate Peer and Dependable, and the

investigation itself. *See Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 842 (9th Cir. 2010); *Cornejo*, 592 F.3d at 128.

B. **Qualified Immunity**

"The doctrine of qualified immunity protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010) (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)). "When confronted with a claim for qualified immunity, [the court] must address two questions: whether the plaintiff's allegations make out a deprivation of a constitutional right, and whether the right was clearly established at the time of defendant's alleged misconduct." *Ibid*. Plaintiffs' three liability theories are considered in turn.

1. **Equal Protection/National Origin Discrimination (Count II)**

The Equal Protection Clause prohibits invidious discrimination based on national origin. *See Abcarian v. McDonald*, 617 F.3d 931, 938 (7th Cir. 2010). Peer and Dependable allege that Lagattuta treated them differently than other locksmiths in Illinois because Peer is of Israeli descent and Dependable is a business owned by a person of Israeli descent. *See* Doc. 74, ¶¶ 84-92. Specifically, Plaintiffs allege that they

> were intentionally treated differently from other similarly situated Illinois locksmiths and locksmith businesses in that: a) the Department undertook an investigation of Plaintiffs before Plaintiffs had even begun conducting business in Illinois, based on Bronzell's complaint and allegations, as well as claims that Plaintiffs were a continuation of Israeli-owned locksmith business Price Line; b) the Department had not previously sought to investigate or scrutinize the applications of any other identifiable group of locksmiths; c) [IDFPR] prosecuted the Plaintiffs without evidence and without even attempting a full or fair investigation of the allegations made against them based on the fact that they were born in Israel and/or owned by someone of Israeli descent; d) the Department summarily suspended

> Plaintiffs' locksmith licenses despite the fact that there was no evidence of any violation by Plaintiffs and that there had never been a summary suspension of a locksmith before; and e) despite the lack of evidence of any violations of the Locksmith Act by Plaintiffs at the Administrative hearing, [IDFPR] indefinitely suspended Plaintiffs' licenses for a minimum of five years.

*Id*. ¶ 88. Lagattuta is absolutely immune from liability for conduct described in items c), d), and e), so analysis is limited to the investigatory conduct described in items a) and b).

To prove their claim, Peer and Dependable must show that Lagattuta's conduct had a "discriminatory effect"—which itself requires them to show that "that they are members of a protected class, that they are otherwise similarly situated to members of the unprotected class, and that [they] were treated differently from members of the unprotected class"—and that Lagattuta was "motivated by a discriminatory purpose." *Chavez v. Ill. State Police*, 251 F.3d 612, 635-36 (7th Cir. 2001). "Discriminatory purpose ... implies more than ... intent as awareness of consequences. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part because of ... its adverse effects upon an identifiable group." *Id*. at 645 (internal quotation marks and citations omitted). If Plaintiffs establish discriminatory effect and purpose, the burden shifts to Lagattuta to show that his conduct was narrowly tailored to advance a compelling state interest. *See Johnson v. California*, 543 U.S. 499, 505 (2005); *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 637 (7th Cir. 2007).

Construing the record in the light most favorable to Peer and Dependable, a jury could find discriminatory effect. It is undisputed that Peer and Dependable are members of a protected class, as Peer was born in Israel and is Dependable's controlling shareholder. A reasonable factfinder could conclude that Peer and Dependable were similarly situated to out-of-state, non-

Israeli locksmith licensees. And a reasonable factfinder could conclude that Peer, Dependable, and the other out-of-state Israeli locksmiths were subject to far greater scrutiny than non-Israeli, out-of-state applicants and licensees. Although a closer question, a jury also could find that Lagattuta manifested a discriminatory purpose in that he acted, "at least in part[,] because of" Peer's and Dependable's Israeli background. *Chavez*, 251 F.3d at 645. The record indicates that Bronzell asked Governor Blagojevich to put pressure on out-of-state, Israeli-owned locksmith companies; that the Governor's Office conveyed that message to IDFPR; and that Lagattuta complied with the request and kept Bluthardt and the Governor's Office apprised of the investigations.

On the discriminatory purpose issue, it is entirely possible, and perhaps probable, that the jury will find that Lagattuta targeted the Israeli locksmiths and Israeli-owned locksmith companies for additional scrutiny not because they were Israeli, but because they shared traits—applying from New York, listing the same New York resident as a contact, and failing by a wide margin a locksmith test administered by one testing service before passing with another testing service—of locksmiths (also Israeli) that had been committing fraud in Illinois. But there are facts in the record—the incessant focus on the Israeli descent of the targeted applicants and licensees, Lobmaster's inability at her deposition to identify any criterion other than national origin for pulling the seven applications for additional scrutiny, and Lagattuta's personal involvement in scrutinizing Israeli-born applicants and licensees—sufficient to create a triable issue on the question. *See Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 722 (7th Cir. 2005) (holding that fact issues regarding discriminatory intent precluded summary judgment); *Willnerd v. First Nat'l Nebraska, Inc.*, 558 F.3d 770, 781-83 (8th Cir. 2009) (same); *compare Chavez*, 251 F.3d at 646 ("The other officers who stated that race might be a factor to consider had nothing to

do with the [traffic] stops of [Plaintiffs].").  Likewise, it is entirely possible, if not probable, that the jury will find that Lagattuta focused on Peer and Dependable because he thought that Dependable was Price Line reconstituted under a different name.  As the state circuit court held, however, IDFPR did not properly bring this charge against Peer and Dependable, and a jury could conclude from that fact that Lagattuta's explanation is not credible.

Lagattuta does not contend that national origin discrimination against Peer and Dependable was a narrowly tailored means of serving a compelling state interest, so Plaintiffs have cleared the first qualified immunity hurdle, that of making out a deprivation of a constitutional right.  The second hurdle is showing that the right was clearly established at the time of Lagattuta's misconduct.  On that question, Lagattuta says very little.  *See* Doc. 77 at 15-16; Doc. 90 at 10-11.  Other than boilerplate recitations of the qualified immunity standard, Lagattuta's only substantive contention is that "Plaintiffs fail to point to analogous cases to establish that they had a constitutional right that was clearly established at the time."  Doc. 90 at 10.

The contention is without merit.  It has been clear since *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), that the Equal Protection Clause prohibits discriminatory enforcement "based on race, national origin, or other suspect classifications."  *Abcarian*, 617 F.3d at 940 ("Equal protection claims are allowed in such circumstances not because the particular law at issue is facially invalid or inapplicable to the plaintiff's conduct, but because of the concern that individuals with discretion in law enforcement will take advantage of that discretion to oppress unpopular groups.") (citing *Yick Wo*, 118 U.S. at 374); *see also Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997) ("The Equal Protection Clause plainly prohibits state actors from intentionally discriminating based on race or national origin.").  Although Plaintiffs cite no

equal protection precedents involving Israeli locksmiths, prevailing case law in 2006 would have put a reasonable government official on clear notice that the Constitution prohibited purposeful discrimination against Peer and Dependable based on Peer's Israeli descent. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("the Constitution prohibits selective enforcement of the law based on considerations such as race," and "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause"); *Chavez*, 251 F.3d at 635 ("it would amount to a violation of the Equal Protection Clause" if the defendant police officers "utilize[d] impermissible racial classifications in determining whom to stop, detain, and search"); *Villagrana v. Vill. of Oswego*, 2005 WL 217033, at *4 (N.D. Ill. Jan. 28, 2005) (plaintiff's "constitutional right not to be discriminated against because of his national origin … was 'clearly established' at the time of the alleged violation" during a domestic violence investigation).

### 2. Equal Protection/Class-of-One (Count III)

Unlike a traditional equal protection claim, which alleges that the plaintiffs "have been arbitrarily classified as members of an identifiable group," a class-of-one claim "asserts that an individual has been irrationally singled out, without regard for any group affiliation, for discriminatory treatment." *United States v. Moore*, 543 F.3d 891, 896 (7th Cir. 2008) (internal quotation marks omitted). That is, "[a] class-of-one claim need not allege discrimination based on a suspect classification, but must allege that the plaintiff was singled out arbitrarily, without rational basis, for unfair treatment." *Abcarian*, 617 F.3d at 938. For their class-of-one claim, Peer and Dependable allege that of the many Israeli-owned locksmith licensees and applicants investigated by IDFPR, Cauble and Lagattuta sought summary and indefinite suspensions only of their licenses. *See* Doc. 74, ¶¶ 93-99; Doc. 85 at 9-11.

The class-of-one claim fails as a matter of law on two independent grounds. First, the class-of-one claim pertains not to the investigation of Peer and Dependable—the claim's premise, after all, is that *many* Israeli-born locksmiths were investigated—but only to the uniqueness of the punishment (summary and indefinite suspensions) sought during the prosecution. As shown in Section A, *supra*, any claim based on prosecutorial conduct is barred by absolute immunity.

Second, even putting aside absolute immunity, Peer's and Dependable's class-of-one theory cannot be reconciled with *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591 (2008), and its progeny. In holding "that class-of-one challenges have no place in the public employment context," *Engquist* "suggest[ed] that such challenges may be inapplicable to *any* governmental action that is the product of a highly discretionary decision-making process." *Moore*, 543 F.3d at 898-99 (emphasis added). As the Supreme Court explained:

> There are some forms of state action … which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be "treated alike, under like circumstances and conditions" is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

*Engquist*, 553 U.S. at 603. The Seventh Circuit has held on at least three occasions that prosecutorial decisions, being highly discretionary, are not subject to class-of-one challenges. *See Avila v. Pappas*, 591 F.3d 552, 554 (7th Cir. 2010) ("class-of-one claims cannot rest on governmental activity that is discretionary by design, a good description of prosecutorial selectivity in criminal law") (internal citation omitted); *Moore*, 543 F.3d at 900 ("because a no-rational-basis challenge to the exercise of prosecutorial discretion is doomed to failure, [a] class-

of-one argument is foreclosed for this reason as well"); *Beales v. City of Plymouth*, 392 Fed. Appx. 497, 498 (7th Cir. 2010) ("[p]rosecutorial decisions entail selectivity," and "[t]he Supreme Court has held [in *Engquist*] that class-of-one claims are not available when the challenged activity entails lawful discretion").

It would be inconsistent with these precedents to permit Peer and Dependable to pursue a class-of-one claim based on the prosecutorial decision to seek summary and indefinite suspensions of their licenses. The same holds for any conceivable class-of-one claim based on the pre-prosecution investigation of Peer and Dependable—although, as noted above, no such claim has been brought. *See Flowers v. City of Minneapolis*, 558 F.3d 794, 799-800 (8th Cir. 2009) ("while a police officer's investigative decisions remain subject to traditional class-based equal protection analysis, they may not be attacked in a class-of-one equal protection claim").

### 3. Substantive Due Process (Count I)

For their substantive due process claim, Peer and Dependable allege that Cauble's and Lagattuta's investigative and prosecutorial activities "constituted a wrongful abuse of power, so outrageous as to 'shock the conscience.'" Doc. 74, ¶ 82. Even putting aside the absolute immunity that bars any claim based on the prosecutorial activities, the substantive due process claim fails as a matter of law on two independent grounds.

First, the Supreme Court has held that where a particular "Amendment provides an explicit textual source of constitutional protection against [a particular sort of government behavior], that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Graham v. Connor,* 490 U.S. 386, 395 (1989); *see also United States v. Lanier,* 520 U.S. 259, 272 n.7 (1997) ("if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be

analyzed under [that] standard"). Here, Peer and Dependable have alleged that a specific constitutional provision, the Equal Protection Clause, protected them from Cauble's and Lagattuta's wrongful conduct. Indeed, even in the section of their summary judgment brief addressing the substantive due process claim, Plaintiffs argue that "Lagattuta knew the real reason Plaintiffs were being singled out for summary suspension was because of their national origin, and that this was at the Governor's direction." Doc. 85 at 12. It follows that Plaintiffs may not also seek relief under a substantive due process theory. *See Eby-Brown Co., LLC v. Wis. Dep't of Agric.*, 295 F.3d 749, 753-54 (7th Cir. 2002) (where plaintiff alleged unequal treatment in state licensing, rejecting substantive due process claim on the ground that plaintiff's "arguments [were] more properly considered claims under the equal protection clause alone"); *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1129 (7th Cir. 1995) (because "licenses to do business … are property, not 'fundamental rights,'" claims regarding regulation of licenses must be evaluated under equal protection rather than substantive due process); *Seiwert v. Spencer-Owen Cmty. Sch. Corp.*, 497 F. Supp. 2d. 942, 951 n.6 (S.D. Ind. 2007) (where substantive due process and equal protection claims are both advanced, the "due process claim is encompassed by and included within an equal protection claim").

Second, settled law holds that a plaintiff cannot seek relief under a substantive due process theory where state law provides an adequate post-deprivation remedy for wrongful conduct that results in a prosecution. *See Fox v. Hayes*, 600 F.3d 819, 841 (7th Cir. 2010); *Avila*, 591 F.3d at 553-54. Illinois law recognizes a malicious prosecution claim for wrongful conduct that results in the bringing of charges, civil or criminal, without justification. *See Alswang v. Claybon*, 351 N.E.2d 285, 288-89 (Ill. App. 1975) ("[a]n action for malicious prosecution is one for damages brought by a person against whom a criminal prosecution, civil

suit or quasi-judicial proceeding has been instituted maliciously and without probable cause"); *Niebur v. Town of Cicero*, 90 F. Supp. 2d 930, 931 (N.D. Ill. 2000) ("victims of baseless administrative proceedings" may bring malicious prosecution action); *see also* Restatement (Second) of Torts § 680 (2010) (recognizing malicious prosecution claim for wrongful "continuation or procurement of civil proceedings against another before an administrative board that has power to take action adversely affecting the legally protected interests of the other"). So, for that reason as well, Peer and Dependable cannot pursue relief under a substantive due process theory.

## Conclusion

Defendants' motion for summary judgment is granted in part and denied in part. Judgment is granted to Defendants on Counts I and III; because Cauble is named only in those Counts, he is dismissed as a party defendant. Judgment is granted to Lagattuta on Count II insofar as it pertains to his decision to seek a summary suspension of Peer and Dependable and all subsequent prosecutorial conduct, but not as it pertains to any prior investigatory conduct.

March 1, 2011

_____
United States District Judge